# United States Court of Appeals
## For the First Circuit

No. 04-2605

TRY ANG AND SOKUNTHEA MEAN,

Petitioners,

v.

ALBERTO R. GONZALES, ATTORNEY GENERAL,

Respondent.

_____

PETITION FOR REVIEW OF AN ORDER

OF THE BOARD OF IMMIGRATION APPEALS

_____

Before

Selya and Lynch, Circuit Judges,

and Smith,[*] District Judge.

_____

Thomas Stylianos, Jr. on brief for petitioners.
Thomas P. Colantuono, United States Attorney, and Aixa
Maldonado-Quiñones, Assistant United States Attorney, on brief for
respondent.

_____

December 1, 2005

_____

_____

[*]Of the District of Rhode Island, sitting by designation.

**SELYA**, **Circuit Judge**.  The petitioners, Try Ang and Sokunthea Mean, are both Cambodian nationals.  They seek judicial review of a final order of the Board of Immigration Appeals (BIA) denying their joint application for asylum, withholding of removal, and relief under the United Nations Convention Against Torture (CAT).  Because Mean's application is derivative and its success is dependent upon the success of Ang's application, see, e.g., Da Silva v. Ashcroft, 394 F.3d 1, 4 n.4 (1st Cir. 2005), we analyze the case as if Ang were the sole petitioner.

Ang assigns error in four respects: (i) failure to consider his membership in a social group when determining his refugee status; (ii) misinterpretation of testimony which, properly construed, would tend to support his claims; (iii) failure to recognize that country conditions had not changed so significantly as to negate any founded fear of future persecution; and (iv) failure to grant asylum for humanitarian reasons.  Finding these claims of error unpersuasive, we deny the petition.

The record reflects that Ang, armed with a tourist visa, entered the United States on April 2, 2000.  His wife, Mean, joined him two months later (having entered the country illegally).  On November 6, they sought asylum.

The Immigration and Naturalization Service (INS) charged the couple with remaining in the United States longer than

permitted.[1]  See 8 U.S.C. § 1227(a)(1)(B).  The INS scheduled a hearing for October 20, 2002.  The petitioners conceded removability and cross-applied for asylum, withholding of removal, relief under the CAT, and in the alternative, voluntary departure.

At an evidentiary hearing held on August 20, 2003, Ang testified about his political activities and employment in Cambodia and the circumstances that brought him and his wife to the United States.  Mean did not testify.

The story, insofar as it is relevant here, began in 1988, when Ang fled to a Cambodian refugee camp in order to escape forced conscription by the reigning government.  The camp was located in an area controlled by a minority political party, the National United Front for a Neutral, Peaceful, Cooperative, and Independent Cambodia (FUNCINPEC).  Ang began working for this party as a volunteer.  He played an active role in the campaign leading up to the 1993 national elections.[2]  The  FUNCINPEC prevailed in the elections and ascended to power.

---

[1]The Homeland Security Act of 2002, Pub. L. No. 107-296, § 471, 116 Stat. 2135, 2205 (codified as amended at 6 U.S.C. § 291(a)), abolished the INS and transferred its duties to the Department of Homeland Security. See Lattab v. Ashcroft, 384 F.3d 8, 13 n.2 (1st Cir. 2004).  For simplicity's sake, we refer throughout to the INS.

[2]Ang claims to have received a death threat from a local police officer due to his political activities, but he never reported such a threat to the authorities.  At any rate, an isolated twelve-year-old threat, made under circumstances that no longer obtain, would be immaterial.

To earn a living, Ang secured employment at the United States embassy. His job was to protect the Americans who worked there. He steadily moved up the ranks and, by the time that the FUNCINPEC came to power, he was in charge of sixty guards. A few years later, he was promoted and given responsibility for supervising 250 guards.

In 1997, a coup engineered by Hun Sen toppled the FUNCINPEC government. Hun Sen's party, the Cambodian People's Party (CPP), assumed control. Ang transported Americans to the safety of the embassy during the insurrection. In his asylum affidavit, he declared that he was not afraid of dying during this period because Hun Sen's supporters "would not dare to harm those who worked with the Americans."

General elections were held in 1998. John Keo, Ang's boss at the embassy, asked him to report on any shootings, kidnapings, or other acts of violence connected with the voting. Ang says that he received a number of veiled threats during this interlude (e.g., "[y]ou will see [what happens] when the U.S. leaves Cambodia"; the United States "cannot protect you all the time").

On March 8, 2000, Ang and other embassy staffers heard a threat that came over their security radios. The unidentified speaker stated: "I will kill John [Keo] and Try [Ang] before they

take the airplane." Keo asked all guards on duty to write reports about the incident. Ang completed his report nine days later.

Ang's departure followed on the heels of this incident. Using a tourist visa issued a few days before the broadcasted threat, Ang left Cambodia. On April 7 — five days after arriving in the United States — he notified the embassy by facsimile transmission of his resignation. He claims that police officers visited his wife twice in the following two days and threatened to kill her if she did not reveal his whereabouts. In roughly two months time, Mean, using a bogus passport that she purchased for $15,000, joined her husband.

Ang testified that he fears he will be killed if he were to return to Cambodia. This fear relates both to his political activities and his past employment. The immigration judge (IJ) disagreed, based partially on a finding that Ang had worked at the American embassy, but that a significant credibility gap marred most of the other aspects of his testimony.

Chronologically, the IJ found that the early threats of which Ang complained, to the extent that they occurred at all, were due to his FUNCINPEC membership. The IJ characterized these threats as unsubstantiated allegations; he deemed them neither convincing nor compelling, especially given Ang's boast that he was not concerned about them.

The IJ attributed the broadcasted death threat to a disgruntled former security guard who had been dismissed from his post. In this regard, the IJ cited Ang's own testimony as demonstrating that he (Ang) did not take the threat seriously.

Moving to Ang's departure, the IJ spotted a flat inconsistency in Ang's stated reason for leaving Cambodia. Ang initially vouchsafed that he left to save his life; he later claimed, however, that he had intended to return after a visit to the United States, but that the subsequent threats reported by his wife convinced him to change his mind. As to those threats, the IJ found Ang's testimony unworthy of credence. In the IJ's view, it was not plausible that Ang's absence would have been noticed so quickly.

Finally, the IJ found that Ang had failed to provide objective facts sufficient to establish a well-founded fear of future persecution.

Based on these findings, the IJ denied the joint application for asylum, withholding of removal, and relief under the CAT, but granted a right of voluntary departure. The petitioners appealed and, on November 2, 2004, the BIA summarily affirmed. This timely petition for judicial review followed.

When the BIA summarily affirms an IJ's decision, the focus, for purposes of judicial review, is on the IJ's decision. We review that determination as if it were the BIA's. See Olujoke

-6-

v. Gonzales, 411 F.3d 16, 21 (1st Cir. 2005). In that process, we assay the IJ's findings of fact, including credibility determinations, under a highly deferential "substantial evidence" standard. See id. That standard demands that we uphold the IJ's decision as long as it is "supported by reasonable, substantial, and probative evidence on the record as a whole." INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992). Absent a mistake of law, the IJ's decision must stand unless a reasonable factfinder would be compelled to reach a contrary conclusion. See 8 U.S.C. § 1252(b)(4)(B); see also Negeya v. Gonzales, 417 F.3d 78, 82 (1st Cir. 2005).

Against this backdrop, we turn to Ang's asylum claim. To qualify for asylum, an alien must demonstrate that he is a refugee as defined by the Immigration and Nationality Act (the Act), 8 U.S.C. §§ 1101-1537. Id. § 1158(b)(1). According to the Act, a refugee is a person who cannot or will not return to his country of nationality or avail himself of that country's protections "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." Id. § 1101(a)(42)(A); see Harutyunyan v. Gonzales, 421 F.3d 64, 67 (1st Cir. 2005); Aguilar-Solis v. INS, 168 F.3d 565, 569 (1st Cir. 1999).

The alien may carry this burden by proving past persecution based on one of the five enumerated grounds and, thus,

animating a rebuttable presumption of future persecution.  See Harutyunyan, 421 F.3d at 67.  If the alien succeeds in making this showing, the burden shifts to the government to prove either "a fundamental change in circumstances such that the [alien] no longer has a well-founded fear of persecution in [his] country of nationality" or that the alien "could avoid future persecution by relocating to another part of [his] country of nationality."  8 C.F.R. § 208.13(b)(1)(i)(A)-(B).

There is another avenue to asylum.  If an alien cannot establish past persecution, he may prove a well-founded fear of future persecution independent of any presumption.  See Rodriguez-Ramirez v. Ashcroft, 398 F.3d 120, 124 (1st Cir. 2005).

In the case at hand, Ang presents a hybrid claim of past persecution.  This claim implicates both his political opinion (his support for the FUNCINPEC) and his membership in a putative social group (Cambodian supporters of the United States).  While it is clear that past persecution based on the former ground would, if proven, confer refugee status, see, e.g., Bocova v. Gonzales, 412 F.3d 257, 262-63 (1st Cir. 2005), determining whether Ang's employment at the American embassy and his assistance to Americans make him a member of a social group within the meaning of the Act is less clear-cut.

Persecution on account of membership in a social group turns on whether the claimed persecution is directed at a person

because of that person's interactions with a band of individuals who share a "common, immutable characteristic." Da Silva, 394 F.3d at 5. Membership may stem from an innate characteristic or a shared experience. Compare, e.g., Gebremichael v. INS, 10 F.3d 28, 36 (1st Cir. 1993) (concluding that family membership can constitute membership in a social group), with, e.g., Mediouni v. INS, 314 F.3d 24, 28 (1st Cir. 2002) (concluding that past employment as a police officer could satisfy the social group membership requirement). Regardless of whether the shared characteristic is genetic or experiential, it must be one that individuals "either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." Da Silva, 394 F.3d at 5.

Ang asserts that he is a member of a social group that shares the common characteristic of supporting the American presence in Cambodia. Support for the Americans, his thesis runs, is an identifiable characteristic that he should not be forced to change due to the actions of individuals who are hostile to the interests of the United States. We agree with Ang's premise that his work at the embassy and his support for Americans potentially could form the basis for a claim of membership in a social group. See id. at 6 (explaining that "characteristics relating to current or former employment status can . . . form the linchpin for assembling a protected social group"). Accordingly, we turn to

Ang's contention that the IJ erred by not factoring both political opinion and social group membership into the past persecution calculus.

We have examined the record with care and find Ang's contention to be unfounded. Although the IJ focused primarily on Ang's political opinion claim, he also took account of Ang's social group membership claim. For example, the IJ noted, in his bench decision, Ang's assertion that "threats were issued against him because he was a security guard for the United States Embassy." Indeed, Ang's pro-American stance and the possibility of persecution arising therefrom comprise one of the few parts of Ang's testimony that the IJ believed.

That the IJ's bench decision contained a heavier emphasis on the political opinion claim than on the social group membership claim is understandable. Both Ang's asylum application and his trial testimony stressed the former claim. In these materials, Ang made many more references to his participation in the FUNCINPEC and to his fear that followers of Hun Sen might retaliate against him than to the consequences of his work at the embassy. It would be absurd to allow an asylum applicant to profit by emphasizing one aspect of a hybrid claim and then complaining when the IJ devotes most of his attention to that aspect. We will not condone that sort of bait-and-switch tactic.

-10-

To say more on this point would be supererogatory. On this record, we conclude, without serious question, that the IJ adequately considered both aspects of Ang's hybrid claim. Consequently, we reject Ang's first assignment of error.

Ang next complains that the IJ "misinterpreted" the evidence of past persecution. This complaint is utterly without merit. Ang testified to a series of vaguely menacing statements and the IJ rejected those statements as unsubstantiated and lacking in probative value.

The baseline rule is that past persecution requires "more than mere discomfiture, unpleasantness, harassment, or unfair treatment." Nikijuluw v. Gonzales, 427 F.3d 115, 120 (1st Cir. 2005). Given that baseline, hollow threats, such as "[y]ou will see [what happens] when the U.S. leaves Cambodia" or the United States "cannot protect you all the time," without more, certainly do not compel a finding of past persecution. There was no misinterpretation here.

To be sure, the broadcasted threat that occurred on March 8, 2002 is cut from different cloth. A direct threat to an individual's life can constitute past persecution. See Aquilar-Solis, 168 F.3d at 569-70. Withal, an asylum applicant must demonstrate a nexus between such a threat and one of the five statutorily protected grounds. See 8 C.F.R. § 208.13(b)(1); see also Rodriquez-Ramirez, 398 F.3d at 124. Here, the record supports

-11-

the IJ's finding that no such connection was forged with respect to the broadcasted death threat.

On this issue, the parties talk past each other. The problem, as we see it, is that Ang misapprehends the IJ's reasoning. In his bench decision, the IJ did not take the view that the broadcasted threat never happened but, rather, attributed the threat to a disgruntled former subordinate. Because the genesis of this threat reasonably can be seen as something other than the petitioner's political views or support of the United States, there is no principled way we can set aside the IJ's determination.

There is one last piece to the question of threat evidence. Ang calumnizes the IJ's determination that the supposed threats to Mean did not occur. Ang did not advance this claim before the BIA, so we will not consider it. See, e.g., Makhoul v. Ashcroft, 387 F.3d 75, 80 (1st Cir. 2004) (explaining that "theories not advanced before the BIA may not be surfaced for the first time in a petition for judicial review of the BIA's final order"). In all events, were this claim properly before us, we would defer to the IJ's credibility finding. See, e.g., Olujoke, 411 F.3d at 21-22 (noting that an appellate court should treat an IJ's adverse credibility determinations with "great respect").

Our rejection of these arguments makes manifest that Ang has not demonstrated past persecution. Hence, he is not entitled

to a rebuttable presumption that a well-founded fear of future persecution exists. This brings us to Ang's third assignment of error: the asseveration that the IJ incorrectly rejected his claim that, unaided by any presumption, he had proved a well-founded fear of future persecution.

To travel this avenue, Ang must show, by a preponderance of the evidence, that he has a well-founded fear of future persecution. See Laurent v. Ashcroft, 359 F.3d 59, 65 (1st Cir. 2004). This showing encompasses both subjective and objective components. See Palma-Mazariegos v. Gonzales, ___ F.3d ___, ___ (1st Cir. 2005) [No. 05-1330, slip op. at 7]. We assume, for argument's sake, that Ang has satisfied the subjective component, that is that he genuinely fears persecution were he to return to Cambodia. Even so, Ang still must satisfy the objective component of the test. See Rodriguez-Ramirez, 398 F.3d at 125 (explaining that "the alien must not only harbor a genuine fear of future persecution, but also must establish an objectively reasonable basis for that fear" (citation and internal quotation marks omitted)). Ang cannot clear this hurdle.

Ang concedes that a regime change has occurred in Cambodia. The FUNCINPEC and the CPP are both integral parts of the coalition government that now rules Cambodia. This circumstance effectively eliminates any argument that Ang would be persecuted in Cambodia for his pro-FUNCINPEC political opinion. Moreover, he has

resigned from the embassy and is no longer a visible member of the social group that he claimed might be the object of persecution. To cinch matters, the record is devoid of any convincing evidence of animus directed at pro-American citizens in Cambodia today. Given this evidentiary mosaic, Ang is powerless to assail the IJ's conclusion that no well-founded fear of future persecution exists. Cf. Palma-Mazariegos, ___ F.3d at ___ [slip op. at 11] (finding that the lack of reported violence directed toward a protected group helps to refute a claimed fear of future persecution).

As a last-ditch effort, Ang points with legitimate pride to a commendation that he received from the U.S. Ambassador to Cambodia, Kenneth Quinn, and posits that he is entitled to asylum for humanitarian reasons because of the support that he provided to the Americans, especially during the 1997 coup. Ang has cited no authority that suggests the Attorney General's decision to grant or withhold humanitarian asylum is judicially reviewable, and there is reason to believe that it is not. Cf. Heckler v. Chaney, 470 U.S. 821, 830 (1985) (explaining that judicial review of an agency's decision would be precluded when "a court [has] no meaningful standard against which to judge the agency's exercise of discretion"). Assuming, for argument's sake, that the decision is judicially reviewable, Ang's importuning for humanitarian asylum here asks us to do too much with too little.

While the Attorney General has discretion to grant asylum for humanitarian reasons, see 8 U.S.C. § 1182(d)(5)(A), establishing a judge-made rule that requires the use of this power to grant asylum to aliens who provide aid and succor to the American government anywhere in the world would rip a mammoth hole in the fabric of the immigration laws. That would usurp Congress's province, and we decline to take so audacious a step.

We add, moreover, that Ang's reliance on the Attorney General's opinion in In re Bassel Marshi, No. A26-980-386 (Op. Att'y Gen. Feb. 13, 2004), is misplaced for another reason as well. There, a Lebanese national was offered asylum because he had provided heroic support to injured marines after the 1983 bombing of a military barracks in Beirut. See id. at 10-11. As an unpublished opinion, Bassel Marshi has no precedential force. See Leal-Rodriguez v. INS, 990 F.2d 939, 946 (7th Cir. 1993) ("We will not bind the BIA with a single non-precedential, unpublished decision any more than we ourselves are bound by our own unpublished orders."); see also 1st Cir. R. 32.3(a)(2).[3]

At this point, we have considered and rejected each of Ang's four remonstrances with respect to his asylum claim. We proceed, therefore to address his withholding of removal claim. We can dispose of that claim with relative ease.

---

[3]We also point out that the Attorney General issued the Bassel Marshi opinion several months after the IJ's decision (though before the BIA's). That fact reinforces our conclusions here.

A claim for withholding of removal imposes "a more stringent burden of proof on an alien than does a counterpart claim for asylum." Rodriguez-Ramirez, 398 F.3d at 123. Withholding of removal requires that an alien establish a clear probability of persecution, rather than merely a well-founded fear of persecution. See Palma-Mazariegos, ___ F.3d at ___ [slip op. at 13]. Hence, the fact that Ang's claim for asylum falls short necessarily dooms his counterpart claim for withholding of removal.

In a similar vein, we need not tarry over Ang's CAT claim. Under the CAT, the United States is prohibited from returning an alien to a country if "there are substantial grounds for believing the [alien] would be in danger of being subjected to torture." Pub. L. No. 105-277, § 2242, 112 Stat. 2681, 2681-822 (1998). To trigger this protection, an alien must show that it is more likely than not that he will be tortured upon returning to his homeland. See Elien v. Ashcroft, 364 F.3d 392, 398 (1st Cir. 2004). "Torture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1). Torture does not include "lesser forms of cruel, inhumane or degrading treatment or punishment." Id. § 208.18(a)(2).

Ang has provided no evidence that he has ever been physically harmed by political adversaries. The vague threats by Hun Sen's supporters clearly do not rise to the level of torture. See, e.g., Ambartsoumian v. Ashcroft, 388 F.3d 85, 94 (3d Cir. 2004) (concluding that "sporadic veiled threats" did not establish a founded fear of prospective torture). The broadcasted death threat does not satisfy the definition of torture because the IJ supportably attributed that threat to a disgruntled ex-employee and not to a public official. See 8 C.F.R. § 208.18(a)(1); see also Kasneci v. Gonzales, 415 F.3d 202, 205 (1st Cir. 2005). Consequently, we hold that the IJ appropriately refused to grant relief under the CAT.[4]

We need go no further. For the reasons elucidated above, we uphold the BIA's final order.

**The petition for judicial review is denied**.

---

[4]We do not consider whether the alleged threats to Mean constitute the basis for a claim of torture because the IJ supportably found Ang's testimony about those threats to be implausible.

-17-