# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PEDRO GARCIA-QUINTERO,
                    *Petitioner,*

v.

ALBERTO R. GONZALES, Attorney
General,
                    *Respondent.*

No. 03-73930

Agency No.
A70-743-609

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
May 9, 2006—Pasadena, California

Filed July 24, 2006

Before: Michael Daly Hawkins, Susan P. Graber, and
Richard A. Paez, Circuit Judges.

Opinion by Judge Paez;
Partial Concurrence and Partial Dissent by Judge Graber

**COUNSEL**

Gary Finn, Indio, California, for the petitioner-appellant.

Peter D. Keisler, Linda S. Wendtland, and Shelley R. Goad, United States Department of Justice, Civil Division, Office of Immigration Litigation, Washington, D.C., for the respondent-appellee.

---

**OPINION**

PAEZ, Circuit Judge:

Petitioner Pedro Garcia-Quintero petitions for review of the Board of Immigration Appeals's ("BIA" or "Board") order that found him removable for alien smuggling, and ineligible for cancellation of removal due to his failure to accrue seven years of continuous residence in the United States after being "admitted in any status." At the removal hearing, Garcia-Quintero's counsel attempted to assert the Fifth Amendment's right against self-incrimination on behalf of Garcia-Quintero. The immigration judge ("IJ"), however, required Garcia-Quintero to assert his Fifth Amendment right himself, but allowed his attorney to advise him about when to exercise this right. After invoking the Fifth Amendment several times, Garcia-Quintero admitted that he tried to help his goddaughter unlawfully enter the United States. On the basis of this testimony, the IJ ordered Garcia-Quintero removed for having engaged in alien smuggling.

Garcia-Quintero appealed the IJ's ruling to the BIA. In addition to challenging the IJ's procedure for invoking the Fifth Amendment, Garcia-Quintero moved to remand his case so the IJ could consider his application for cancellation of removal. In an unpublished order, the BIA rejected his appeal, and also denied his motion because it determined that he

failed to satisfy the seven-year continuous residence requirement for cancellation of removal. In its ruling, the BIA concluded that Garcia-Quintero's status as a beneficiary of the Family Unity Program ("FUP") did not render him "admitted in any status" for the purposes of cancellation of removal.

The BIA's decision denying the motion to remand involves an interpretation of the interplay between the FUP and the cancellation of removal statute, 8 U.S.C. § 1229b. As a preliminary matter, we hold that the BIA's unpublished non-precedential decision does not merit *Chevron* deference. The decision, however, is eligible for some deference under *Skidmore*. As for the merits of Garcia-Quintero's claim for cancellation of removal, he raises an issue of first impression in this circuit as well as in most of our sister circuits[1]—whether his acceptance into the Family Unity Program renders him "admitted in any status" for the purposes of cancellation of removal. We hold that it does, and therefore determine that Garcia-Quintero is eligible for cancellation of removal.

Finally, we examine the merits of Garcia-Quintero's claim that the IJ violated his Fifth Amendment rights when the IJ required him to personally invoke his right against self-incrimination, and therefore the removal proceeding should have been terminated. We conclude that on the record here, where the IJ allowed Garcia-Quintero's counsel to advise him when to invoke the privilege, and where Garcia-Quintero had successfully done so in response to several questions, the IJ did not violate his Fifth Amendment rights, and thus the removal proceeding was proper. We therefore grant the petition in part and remand, and deny in part.

---

[1]The Fifth Circuit has addressed this issue in an unpublished opinion. *See Diaz v. Ashcroft*, 108 Fed.Appx. 972 (5th Cir 2004) (per curiam).

## I. Background

Garcia-Quintero, a citizen of Mexico, entered the United States unlawfully in 1986, and has resided here for the last twenty years. He is married to a lawful permanent resident ("LPR"), and has four LPR children and several United States citizen grandchildren. He has no criminal record. In 1993, Garcia-Quintero was accepted into the FUP.

The Family Unity Program was created to implement certain provisions of the Immigration Act of 1990, Pub. L. No. 101-649, § 301, 101 Stat. 4978 ("IMMACT 90"), which is set out as a note in 8 U.S.C. § 1255a. The regulations governing the FUP are contained in 8 C.F.R. § 236. The FUP permits qualified alien spouses or unmarried children of legalized aliens, who entered the United States before 1988 and have continuously resided in the United States since that time, to apply for the benefits of the program, which include protection from deportation and authorization to work in the United States.[2]

As the name implies, the FUP is designed to help families stay together while the beneficiaries adjust to LPR status. FUP beneficiaries are granted a two-year period of protection from deportation, which the regulation terms "voluntary departure." 8 C.F.R. § 236.15(c). An FUP beneficiary may

---

[2]Section 301(a) provides that:

> [A]n alien who is an eligible immigrant (as defined in subsection (b)(1)) as of May 5, 1988, who has entered the United States before such date, who resided in the United States on such date, and who is not lawfully admitted for permanent residence, the alien— (1) may not be deported or otherwise required to depart from the United States . . . and (2) shall be granted authorization to engage in employment in the United States and be provided an "employment authorized" endorsement or other appropriate work permit.

Pub. L. No. 101-649, § 301 (2006).

apply to extend this grant of voluntary departure so long as he remains eligible for the program. 8 C.F.R. § 236.15(e). An FUP beneficiary may also apply to travel outside the United States. 8 C.F.R. § 236.16. Upon return from authorized travel, an FUP beneficiary, provided he remains admissible, is "admitted in the same immigration status as the alien had at the time of departure, and shall be provided the remainder of the voluntary departure period previously granted under the Family Unity Program." *Id.*

Garcia-Quintero extended his status as an FUP beneficiary in 1995, and became an LPR in 1998. In June 2001, Garcia-Quintero received a Notice to Appear in Removal Proceedings, which charged him with being removable as an alien smuggler because he "knowingly, induced, assisted, abetted, or aided [another] alien to enter or to try to enter the United States in violation of [§ 212(a)(6)(E)(i) of the Immigration and Nationality Act ('INA')]."

At the removal hearing, counsel for the Immigration and Naturalization Service ("INS")[3] called Garcia-Quintero, its only witness, to testify. Before the direct examination began, Garcia-Quintero's attorney informed the IJ that he had advised his client "to claim the benefit of his Fifth Amendment right not to incriminate himself . . . if he is asked to testify as to his role in any alien smuggling." The IJ allowed the attorney to confer with and advise Garcia-Quintero, but required Garcia-Quintero to assert his Fifth Amendment right himself. Through an interpreter, Garcia-Quintero answered questions regarding his background, but then invoked his Fifth Amendment right when the Government asked him whether he had traveled to Mexico in June 2001, and whether he had been charged with any criminal violations that year.

---

[3]On March 1, 2003, the INS was abolished, and its functions were transferred to the newly created Department of Homeland Security. *See Aguilera-Ruiz v. Ashcroft*, 348 F.3d 835, 835 n.* (9th Cir. 2003). Because the INS existed at the time of Garcia-Quintero's hearing, we refer to the INS, or "Government," in this opinion.

After invoking the Fifth Amendment in response to these questions, Garcia-Quintero answered the Government's questions concerning the June incident. He testified that an immigration officer detained him and his goddaughter at the port of entry in Calexico because he tried to help her cross the border into the United States by presenting false documents to the immigration inspector. When the Government completed its examination, Garcia-Quintero's attorney declined to ask him any questions, but stated that it was unfair that he was not permitted to assert the Fifth Amendment on behalf of his client. The attorney, however, also stated that he could not point to anything to show that Garcia-Quintero did not understand that he was incriminating himself by testifying about the June incident. Based upon Garcia-Quintero's testimony, the IJ determined that he knowingly participated in alien smuggling, and was therefore subject to removal.

Garcia-Quintero appealed the IJ's decision to the BIA, arguing that because his counsel was not allowed to assert the Fifth Amendment privilege for him, the IJ forced Garcia-Quintero to incriminate himself in violation of the Fifth Amendment. Moreover, because his testimony was the only evidence the Government presented, Garcia-Quintero argued that his removal hearing should have been terminated given the Fifth Amendment violation. He also requested that his appeal be reviewed by a three-member panel of the BIA.

While the appeal was pending, Garcia-Quintero filed a motion to remand to the immigration court so that the IJ could consider his application for cancellation of removal pursuant to 8 U.S.C. § 1229b.[4] Garcia-Quintero argued that he was eli-

---

[4]Cancellation of removal is available, at the Attorney General's discretion, for an LPR who is inadmissible or deportable if he:

(1) has been an alien lawfully admitted for permanent residence for not less than 5 years,

(2) has resided in the United States continuously for 7 years after having been admitted in any status, and

gible for cancellation of removal because, as a consequence of his 1993 acceptance into the FUP, he was "admitted in any status," and therefore he satisfied the residence requirement by having resided continuously in the United States for seven years. Along with his motion, Garcia-Quintero submitted a declaration in which he remorsefully admitted to the conduct underlying the charge of alien smuggling.

In a one-member unpublished order, the BIA dismissed Garcia-Quintero's appeal and denied his motion to remand. The BIA determined that the IJ did not err in requiring Garcia-Quintero to invoke personally his Fifth Amendment right against self-incrimination, on a question-by-question basis, and thus his testimony was properly considered. The BIA further held that Garcia-Quintero failed to establish his prima facie eligibility for cancellation of removal. Because he became an LPR in 1998 and his residency ended in 2001, when he received the Notice to Appear, the BIA concluded that Garcia-Quintero had not resided continuously in the United States for seven years after having been "admitted in any status." In so holding, the BIA rejected Garcia-Quintero's argument that he was first admitted when he was accepted into the FUP in 1993. Garcia-Quintero timely petitioned for review of the BIA's decision.

## II.   Discussion

### A.   Judicial Review of the BIA's Decision

*Standard of Review*

Where, as here, the BIA reviews *de novo* the IJ's decision, our review is limited to the decision of the BIA. *Hernandez*

---

(3)  has not been convicted of any aggravated felony.

18 U.S.C. § 1229b(a) (2006). It is uncontested that Garcia-Quintero meets the first and third requirements; rather, the focus of his motion to remand, and this appeal, was the second prong.

*v. Ashcroft*, 345 F.3d 824, 832 (9th Cir. 2003). We review for abuse of discretion the BIA's denial of a motion to remand. *Movsisian v. Ashcroft*, 395 F.3d 1095, 1098 (9th Cir. 2005). However, we review *de novo* the BIA's determination of questions of law, except to the extent that deference is owed to its interpretation of the governing statutes and regulations. *Simeonov v. Ashcroft*, 371 F.3d 532, 535 (9th Cir. 2004), *cert. denied*, 543 U.S. 1052 (2005).

Chevron *Deference*

**[1]** As previously noted, in denying Garcia-Quintero's motion to remand, the BIA determined that the FUP beneficiary status does not render one "admitted in any status" for the purposes of cancellation of removal. Thus, the initial question presented is whether we should accord the BIA's decision in this case the deferential review prescribed by the Supreme Court in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

In *Chevron,* the Supreme Court established a two-pronged framework for judicial review of administrative agency interpretations of the statutes and regulations that it administers. 467 U.S. at 842-43; *Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1059 (9th Cir. 2003) (en banc). If congressional intent is clear, both the court and the agency must "give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 843. If, however, Congress has not directly addressed the exact issue in question, a reviewing court must defer to the agency's construction of the statute so long as it is reasonable. *Id.* In other words, unless an agency's statutory interpretation is "arbitrary, capricious, or manifestly contrary to the statute," *id.* at 844, the agency is accorded *Chevron* deference*,* and the court must adopt the agency's view.

**[2]** "*Chevron* deference, however, does not apply to all statutory interpretations issued by agencies." *Miranda Alvarado*

*v. Gonzales*, 449 F.3d 915, 921 (9th Cir. 2006). In *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001), the Supreme Court elucidated the scope of *Chevron*, holding that *Chevron* deference applies only "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, *and* that the agency interpretation claiming deference was promulgated in the exercise of that authority." (emphasis added). *Mead* thus placed crucial "limits [on] *Chevron* deference owed to administrative practice in applying a statute," clarifying that agency interpretations promulgated in a non-precedential manner are "beyond the *Chevron* pale." *Id.* at 226, 234; *see also Hall v. EPA*, 273 F.3d 1146, 1156 (9th Cir. 2001) ("Interpretations of the Act set forth in such non-precedential documents are not entitled to *Chevron* deference.").

It is well-established that Congress delegated to the BIA the authority to promulgate rules, on behalf of the Attorney General, that carry the force of law "through a process of case-by-case adjudication." *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) (internal quotation marks omitted) (holding that *Chevron* deference applies to the BIA based on the statutory allocation of power laid out by Congress in the INA); *see also* 8 C.F.R. § 1003.1(d)(1). Thus, the focus of our inquiry in this case is on the latter part of *Mead*'s limitation on *Chevron*—whether the BIA's decision in this case "was promulgated in the exercise of that authority," *Mead*, 533 U.S. at 227, i.e., whether the BIA's decision had a "lawmaking pretense" that binds third parties, *Miranda Alvarado*, 449 F.3d at 922 (internal quotation marks omitted). As discussed below, because the BIA's decision was an unpublished disposition, issued by a single member of the BIA, which does not bind third parties, we conclude that it does not carry the force of law.

**[3]** In light of *Mead*, the "essential factor" in determining whether an agency action warrants *Chevron* deference is its precedential value. *Miranda Alvarado*, 449 F.3d at 922; *see*

*also High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 648 (9th Cir. 2004) (refusing to accord *Chevron* deference when the agency was "not acting in a way that would have precedential value for subsequent parties"). Despite Garcia-Quintero's request that his appeal be reviewed by a three-member panel of the BIA, his appeal and motion were reviewed by a single member of the BIA, on behalf of the BIA, pursuant to 8 C.F.R. § 1003.1(e)(5). Under 8 C.F.R. § 1003.1(e)(5), a single board member is charged with the task of deciding an appeal and issuing a brief order, unless the member determines that an opinion is necessary and therefore designates the case for decision by a three-member panel under § 1003.1(e)(6). A case must be decided by a three-member panel if it presents "[t]he need to establish a precedent construing the meaning of laws, regulations, or procedures." 8 C.F.R. § 1003.1(e)(6)(ii). The BIA's Practice Manual reiterates this requirement that three-member panels decide precedential cases. *See* BIA Prac. Man., Ch. 1.3(a)(i) (rev. 6/15/04) ("[A] single Board Member decides cases *unless* the case falls into one of six categories that require a decision by a panel of three Board Members [such as] the *need to establish a precedent* construing the meaning of laws, regulations or procedures.") (emphases added), *available at* http://www.usdoj.gov/eoir/bia/qapracmanual/apptmtn4.htm. Moreover, only "selected decisions of the Board rendered by a three-member panel or by the Board en banc may be designated to serve as precedents." 8 C.F.R. § 1003.1(g). Because the BIA decision in this case does not fall into either category, it is non-precedential.

**[4]** The unpublished designation of the decision also makes it clear that it was not issued pursuant to the BIA's authority to make rules that carry the force of law. *See In re Garcia-Quintero*, 2003 WL 23216738 (B.I.A. Order Sept. 23, 2003) (stating at the top of the decision "**THIS IS AN UNPUBLISHED DECISION THAT CANNOT BE CITED**"). Again, according to the Board's own internal policies, "[u]npublished decisions are binding on the parties to the

decision but are *not* considered precedent for unrelated cases." BIA Prac. Man., Ch. 1.4(d)(ii) (rev. 6/15/04). Because unpublished decisions "lack precedential value," this court, and other circuits, have declined to give them deferential treatment under *Chevron*. *Chan v. Reno*, 113 F.3d 1068, 1073 (9th Cir. 1997) (refusing to defer to an unpublished disposition that, "by the INS's own regulations . . . carr[ies] no precedential weight"); *see also Cruz v. Attorney Gen. of U.S.*, ___ F.3d ___, 2006 WL 1687393, at *8 (3d Cir. 2006) (recognizing that unpublished BIA decisions are not designated as precedential); *Ajdin v. Bureau of Citizenship & Immigration Servs.*, 437 F.3d 261, 264-65 (2d Cir. 2006) (per curiam) ("[U]npublished opinions of the BIA have no precedential value."); *Ang v. Gonzales*, 430 F.3d 50, 58 (1st Cir. 2005) ("[A]n unpublished opinion [issued by the Attorney General] . . . has no precedential force."); *Hernandez*, 345 F.3d at 839 n.13 (refusing to give *Chevron* deference to an unpublished BIA decision because it "was not designated as precedential"); *Leal-Rodriguez v. INS*, 990 F.2d 939, 946 (7th Cir. 1993) ("We will not bind the BIA with a single non-precedential, unpublished decision any more than we ourselves are bound by our own unpublished orders.").

The Government argues that the Supreme Court's decision in *Aguirre-Aguirre* suggests that the BIA's decision in this case merits *Chevron* deference. 526 U.S. 415. In *Aguirre-Aguirre*, the Court accorded *Chevron* deference to an unpublished BIA decision that interpreted the meaning of a "serious nonpolitical crime," as contained in a prior version of 8 U.S.C. § 1253. Despite the facial similarity between *Aguirre-Aguirre* and the present case, key distinctions defeat the Government's argument. First, *Aguirre-Aguirre* was issued before *Mead*, and therefore the BIA's order in that case was not subject to the limitations that *Mead* placed on the breadth of *Chevron*. Although *Mead* cited *Aguirre-Aguirre*, the Supreme Court did not affirm, or even mention, the application of *Chevron* to unpublished BIA decisions. Rather, in a footnote, the *Mead* Court cited *Aguirre-Aguirre*, along with twenty-five

other cases, to support its statement that "the overwhelming number of our cases applying *Chevron* deference have reviewed the fruits of notice-and-comment rulemaking or formal adjudication." 533 U.S. at 230; *see id.* at 230 n.12.

Second, and more importantly, the unpublished order in *Aguirre-Aguirre* relied on a statutory interpretation of "serious nonpolitical crime" that the BIA had adopted in an earlier precedential decision.[5] 526 U.S. at 418. That is, the precise issue of statutory interpretation had been answered by the BIA in a published decision that carried the force of law. Additionally, the BIA already had rejected, in a different precedential decision, the interpretation that the court of appeals adopted in lieu of the BIA's approach. *See id.* at 425 (stating that because the BIA, in *Matter of Rodriguez-Coto*, 19 I. & N. Dec. 208, 209-10 (B.I.A. 1985), rejected an approach that takes into account evidence of persecution, the appellate court erred in considering the risk of persecution).

In Garcia-Quintero's case, however, both parties concede that the BIA has never issued a published decision addressing the precise question at issue. Although the BIA's order cited several published BIA decisions, none of them sets forth a binding interpretation of the question at issue. In sum, unlike in *Aguirre-Aguirre*, the BIA's decision in Garcia-Quintero's case was not compelled by precedent.

[5] In denying Garcia-Quintero's motion, the BIA did not issue a precedential interpretation of the relevant FUP statutory provisions, although it could have done so. *See Hernandez*, 345 F.3d at 839 n.13. In light of *Mead*, our case law, the BIA's governing regulations, and its internal policies and practices, the unpublished single-member order makes clear that the BIA issued a decision that lacked the force of law.

---

[5]*See Matter of McMullen*, 19 I. & N. Dec. 90 (B.I.A. 1984), *aff'd*, 788 F.2d 591 (9th Cir. 1986).

Therefore, we do not accord *Chevron* deference to the BIA's decision in this case.

Skidmore *Deference*

**[6]** The Supreme Court has made clear, however, that *Chevron* deference is not the only type of deference available to an agency interpretation of its governing statutes or regulations. *Mead*, 533 U.S. at 237 ("[T]he range of statutory variation has led the Court to recognize more than one variety of judicial deference."); *Hall*, 273 F.3d at 1156 ("[A]n agency interpretation that is not accorded *Chevron* deference still may be entitled to a respect proportional to its power to persuade." (internal quotation marks omitted)). Forty years before *Chevron*, the Supreme Court addressed how courts should treat non-binding agency interpretations, recognizing that "while not controlling upon the courts by reason of their authority, [these interpretations] do constitute a body of experience." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). The Court in *Skidmore* held that "[t]he weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id.*

Given *Mead*'s holding that "*Chevron* left *Skidmore* intact and applicable where statutory circumstances indicate . . . [the] authority to make rules with force of law . . . was not invoked," we must undertake a *Skidmore* assessment of the BIA's decision to determine whether it warrants deference. 533 U.S. at 237; *see also Padash v. INS*, 358 F.3d 1161, 1168 n.6 (9th Cir. 2004) (suggesting that "*Skidmore* rather than *Chevron*," is the proper level of deference to accord a non-precedential BIA decision). As discussed below, our *Skidmore* assessment counsels against adopting the BIA's interpretation in this case.

B.   An FUP beneficiary is "admitted in any status"

In light of *Skidmore*, we must examine the validity of the BIA's reasoning, its thoroughness, and overall persuasiveness. To do so, we turn to the heart of Garcia-Quintero's appeal from the denial of his motion to remand—whether acceptance into the Family Unity Program renders Garcia-Quintero "admitted in any status" for cancellation of removal purposes. In answering this question in the negative, the BIA provided two discrete reasons—(i) Garcia-Quintero was not "admitted in any status" under the definition of "admitted" in § 1101 of the INA, 8 U.S.C. § 1101(a)(13); and (ii) Congress has not manifested an intent to construe FUP beneficiaries as having been "admitted." As explained below, because neither of these reasons is persuasive, we reject the BIA's position and conduct a *de novo* review of the question.

**[7]** Although the BIA is correct that Garcia-Quintero's enrollment into the FUP did not literally comport with the INA's definition of "admitted," both this court and the BIA, in precedential decisions, have not limited the scope of "admitted" to this strict definition. Rather, we and the BIA have held that there are circumstances outside the bounds of the INA's definition in which an alien may nonetheless be "admitted." Under the INA, an alien is "admitted" if he undergoes a "lawful entry . . . into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13). Because Garcia-Quintero was already in the United States, the BIA determined that his entrance into the FUP did not constitute an admission into this country, and therefore he was not "admitted in any status."

The BIA's analysis suffers fatally from its limited reading of "admitted"—a constraint which it has not applied in other decisions. In *In re Rosas-Ramirez*, for example, the BIA held that the attainment of LPR status constitutes admission, even when an alien entered without inspection. 22 I. & N. Dec. 616

(B.I.A. 1999);[6] *see also Ocampo-Duran v. Ashcroft*, 254 F.3d 1133, 1134-35 (9th Cir. 2001) (rejecting as "overly narrow" the petitioner's claim that he was never "technically" admitted to the United States because he entered without inspection). This court recently looked beyond the INA's definition of admission in *Cuevas-Gaspar v. Gonzales*, 430 F.3d 1013, 1029 (9th Cir. 2005), and held that an LPR parent's admission can be imputed to the parent's unemancipated minor child, who resides with the parent, for the purposes of satisfying the same cancellation of removal requirement at issue in this case —seven years of continuously residing in the United States after having been "admitted in any status." In so holding, this court acknowledged that there are instances where an alien is "admitted," for the purposes of § 1229b(a)(2), without having been inspected and authorized to enter the United States at the border. *Id.* at 1028.

In *Cuevas-Gaspar*, we further determined that our understanding of "admitted" comports with the legislative purpose of cancellation of removal. Section 212(c), the predecessor to § 1229b, required an alien seeking relief from removal to have "lawful unrelinquished domicile of seven consecutive years." *Id.* at 1027. This requirement caused much confusion among the executive and judicial branches—the BIA and courts of appeals disagreed about the status necessary to satisfy this requirement. *Id*. Ultimately, Congress designed the dual requirement of a five-year legal permanent residency *and*

---

[6]Although *Rosas-Ramirez* illustrates that the BIA has not always confined "admission" to the definition in 8 U.S.C. § 1101(a)(13), we do not, as the dissent suggests, base our conclusion that the BIA's analysis here is unpersuasive on this case alone. We recognize that *Rosas-Ramirez* involved LPR, rather than FUP, status, and therefore does not directly apply to the present case. Nonetheless, in light of the BIA's ruling in Garcia-Quintero's case, it is noteworthy that the BIA, in other contexts, has determined that an act of "admission" need not always satisfy the literal terms of the definition. *Rosas-Ramirez*, 22 I. & N. Dec. at 623 ("[T]hat definition does not set forth the sole and exclusive means by which admission to the United States may occur under the Act.").

seven-year continuous residence in any status, § 1229b(a)(1)-(2), "to clear up prior confusion and to strike a balance between the conflicting interpretations . . . by counting a limited period of time spent in non-permanent status while still requiring at least five years of permanent resident status." *Id.* at 1028.

This legislative history combined with the fact that § 1229b(b)(1)(A) requires non-permanent residents to be physically present for at least ten years immediately preceding the date of application for cancellation of removal, led this court in *Cuevas-Gaspar* to conclude that "admission" is not limited to the definition listed in 8 U.S.C. § 1101(a)(13). If it were, LPRs would have a more onerous residence requirement than non-permanent residents, thereby "frustrating Congress's well-established policy of affording [the former] more benefits than [the latter]." *Id.* Although this legislative history does not reveal congressional intent regarding the FUP, it does show that Congress did not intend to limit "admission" to physical entry and inspection, leaving open the possibility of admission by other means.[7]

[8] In light of *Cuevas-Gaspar*, and BIA precedent, admission is not always limited to inspection and authorization at the point of entry. Therefore, the BIA's reasoning—that Garcia-Quintero was not "admitted" because his receipt of

_____

[7]The Government contends that § 301(f) of IMMACT 90 clearly shows that Congress did not intend participation in the FUP to constitute an admission. We disagree. Section 301(f) states that "[n]othing in this section shall be construed as authorizing an alien to apply for admission to, or to be admitted to, the United States *in order to* obtain benefits under this section." (emphasis added). The plain meaning of subsection (f) merely bars aliens residing outside the United States on the date of IMMACT 90's enactment from entering the country *in order to* apply for FUP status. Therefore, while the dissent correctly notes that § 301(f) was intended to limit the number of aliens that are "admitted to" the United States, the limitation, contrary to the dissent's assertion, only applies to aliens who, unlike Garcia-Quintero, did not reside in the United States at the time the FUP was instituted.

FUP status "could not have involved his entry into the United States after inspection and authorization by an immigration officer"—is unpersuasive. This, however, does not end our inquiry, because we have addressed only the first word in the phrase "admitted in any status." We next consider whether being an FUP beneficiary constitutes "any status" for cancellation of removal purposes.

Although not mentioned by the BIA in its decision in this case, the BIA has, in a precedential decision, discussed extensively the meaning of "in any status." *See In re Blancas-Lara*, 23 I. & N. Dec. 458, 461 (B.I.A. 2002). In *Blancas-Lara*, the BIA held that the period of an alien's residence in the United States as a *nonimmigrant* counts in calculating the seven years of continuous residence for cancellation of removal purposes. *Id.* at 460. Although the case involved LPR-imputed residence, the BIA expressly declined to reach that issue, and instead found that "under the plain meaning of the statutory language, the respondent's period of residence after his admission as a nonimmigrant . . . may be considered in calculating the period of continuous residence for purposes of section 240A(a)(2)." *Id.* at 459. As a result, the nonimmigrant was eligible for cancellation of removal, even though he, like Garcia-Quintero, had been an LPR for less than seven years.

In so holding, the BIA analyzed the meaning of "in any status." It stated:

> Although no specific definition of the word "status" is included in section 101 of the [INA], it is generally defined in the legal context as a "[s]tanding; state or condition," and as "[t]he legal relation of [an] individual to [the] rest of the community." Black's Law Dictionary 1264 (5th ed. 1979). "Status" is a term of art, which is used in the immigration laws in a manner consistent with the common legal definition. It denotes someone who possesses a certain legal standing, e.g., classification as an immi-

grant or nonimmigrant. The use of the word "any" to modify the word "status" indicates that Congress intended section 240A(a)(2) to include admissions of nonimmigrants as well as immigrants. Thus, the plain language of section 240A(a)(2) encompasses nonimmigrants admitted to the United States who thereafter reside in the United States for at least 7 years.

*Id.* at 460. In *Blancas-Lara*, the BIA determined that a nonimmigrant, who was admitted for only a temporary period with a border crossing card, could use his date of admission as the beginning of his continuous residence for cancellation of removal purposes because of his "status" as a nonimmigrant. The BIA's analysis in *Blancas-Lara* weighs heavily in Garcia-Quintero's favor. As he argues in his brief to this court, it surely would be odd for the BIA to hold that although a nonimmigrant temporarily in the United States can accumulate time for cancellation of removal purposes, an FUP beneficiary, who has maintained that status for four years while applying for adjustment to LPR status—the very purpose of the program—cannot.

As previously mentioned, the protection from deportation that the FUP grants its beneficiaries is labeled "voluntary departure," which is not defined in the governing FUP regulations. As the term is traditionally used, "voluntary departure" refers to the "time period during which [an] alien may leave the United States voluntarily rather than be removed." *Zazueta-Carrillo v. Ashcroft*, 322 F.3d 1166, 1168 (9th Cir. 2003); 8 U.S.C. § 1229c. When the INS, BIA, or IJ—all of whom can authorize voluntary departure—grants an alien voluntary departure, the alien, who is removable from the United States, "avoid[s] the stigma of compulsory ejection . . . select[s] his or her own destination . . . [and retains] the possibility of return to the United States." *Contreras-Aragon v. INS*, 852 F.2d 1088, 1090 (9th Cir. 1988) (en banc), *superseded by statute*, Illegal Immigration Reform and Immigrant Responsibil-

ity Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009, as recognized in *Zazueta-Carrillo*, 322 F.3d at 1068. Under § 1229c, an alien who accepts voluntary departure agrees to leave the United States within the allotted time.

**[9]** The grant of voluntary departure under § 1229c is significantly different from the purpose and benefit of FUP voluntary departure. Unlike the removal context, in which voluntary departure focuses on the alien's *leaving* the United States due to his removability, FUP voluntary departure focuses on the alien's *staying* in the United States while he adjusts his status to LPR. In other words, whereas a removable alien who is granted voluntary departure may remain in the United States for a limited time to prepare for his departure and avoid forced removal, Garcia-Quintero, as an FUP beneficiary, was allowed to remain in the United States for two-year renewable intervals while he worked and adjusted his status to LPR. Thus, despite the common name, it is clear that FUP voluntary departure differs from traditional voluntary departure in the removal context. Moreover, even if voluntary departure in the context of the FUP is no different than its use in the conventional removal context, this does not mean that participation in the FUP is not a recognized status given *Blancas-Lara* and the plain meaning of "in any status." Although the grant of voluntary departure may accord an alien only limited benefits and protections, it is a status nonetheless.[8]

**[10]** Finally, "admitted" and "status" do in fact appear together in one section of the FUP regulations. Section 236.16

---

[8]In *Diaz v. Ashcroft*, the Fifth Circuit held, in an unpublished decision, that FUP beneficiaries are not "admitted in any status" for cancellation of removal purposes. 108 Fed.Appx. at 973. The court reasoned that the grant of voluntary departure under FUP "does *not* constitute an admission in any status." *Id.* at 975 (internal quotation marks omitted). Based on the foregoing, we disagree. Therefore, although, as the dissent notes, unpublished opinions in the Fifth Circuit may be considered for their persuasive value, *see* Fifth Circuit Rule 47.5.4, the court's decision in *Diaz* lacks such force.

authorizes travel outside of the United States if an FUP beneficiary submits a proper application to INS. As previously stated, upon return from his travels, an FUP beneficiary "shall be inspected and *admitted* in the same immigration *status* as the alien had at the time of departure," assuming that he is not somehow inadmissible. 8 C.F.R. § 236.16 (emphases added). By its terms, § 236.16 presupposes that FUP beneficiaries have an "immigration status," albeit a limited one. The limitations of this status, however, are irrelevant given that § 1229b(a)(2) requires admission "in any status." That is, because FUP beneficiaries who travel outside the United States are "admitted in the same immigration status" upon return, it is only logical that acceptance into the FUP confers some type of immigration status on the beneficiaries of the program, all of whom are non-LPRs.[9] Perhaps this logic is what motivated the Government to concede at oral argument that participation in the FUP could be construed as a status.

[11] In sum, the plain meaning of "admitted in any status," the legislative history of § 1229b, and the precedential deci-

---

[9]A recent case in this circuit adds further support for this conclusion. In *Yepez-Razo v. Gonzales*, we held that an FUP beneficiary was "lawfully residing" in the United States from the date of her acceptance into the FUP, which rendered her eligible for a § 212(h) waiver from removal. 445 F.3d 1216, 1217 (9th Cir. 2006). *Yepez-Razo* involved a dispute about when the petitioner became an FUP beneficiary, stemming from the INS's initial wrongful denial of her FUP application. The INS did not dispute that, as an FUP beneficiary, the petitioner was "lawfully residing" in the United States, rather it only contested the date that she became a beneficiary. Moreover, the court noted that through FUP, "Congress intended to create mandatory protections for qualifying immigrants." *Id.* at 1219. Although *Yepez-Razo* does not address the interplay between FUP and § 1229b(a)(2), it does suggest that FUP beneficiaries are accorded a limited immigration status—one that grants them certain protections and authorizes their stay in the United States. *See also* Memorandum from Johnny N. Williams, INS Exec. Assoc. Comm'r, Office of Field Operations, *Family Unity Benefits and Unlawful Presence*, File. No. HQADN 70/10.19 (Jan. 27, 2003) ("[I]f an alien is granted FUP benefits, he or she will be deemed to be in a period of stay authorized by the Attorney General.") (cited in *Yepez-Razo*, 445 F.3d at 1219).

sions of the BIA and this circuit, lead us to hold that acceptance into the Family Unity Program constitutes "admitted in any status" for the purposes of cancellation of removal. We therefore grant Garcia-Quintero's petition regarding his motion to remand, and we remand to the BIA for further proceedings as it deems appropriate.

## C. Fifth Amendment Challenge

Garcia-Quintero also challenges the BIA's affirmance of the IJ's decision to order him removed. As explained above, at the removal hearing, Garcia-Quintero's attorney advised him to assert his Fifth Amendment right against self-incrimination when asked about any conduct that implicated the alien smuggling charge. Although the IJ forbade the attorney from invoking Garcia-Quintero's Fifth Amendment right for him, the IJ allowed them to consult one another. After asserting the privilege twice, Garcia-Quintero confessed to the conduct underlying the alien smuggling charge. Garcia-Quintero argues that the IJ committed a "legal error" by refusing to allow his attorney to assert his Fifth Amendment right for him, and therefore the removal proceeding was improper. We disagree.

**[12]** The Fifth Amendment privilege against self-incrimination applies in removal hearings where the alien's testimony could expose him to future criminal prosecution. *Wall v. INS*, 722 F.2d 1442, 1443 (9th Cir. 1984). However, "[t]he only way the privilege can be asserted is on a question-by-question basis, and thus as to each question asked, the party has to decide whether or not to raise his Fifth Amendment right." *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1263 (9th Cir. 2000). Thus, to the extent that Garcia-Quintero argues that the IJ violated his Fifth Amendment right by requiring that he assert the privilege after each question, his argument fails.

**[13]** Garcia-Quintero bases his claim in large part on the fact that he needed the assistance of an interpreter, which implies that he did not understand what he was doing by answering the Government's questions. Yet, his attorney acknowledged at the removal hearing that he could not point to anything that would show that Garcia-Quintero did not understand that he was incriminating himself by relaying the details of the June incident in question. Moreover, Garcia-Quintero successfully invoked the privilege twice before he began to answer the Government's questions, which were not duplicative of earlier ones. Although it is certainly possible for a person who initially invokes the Fifth Amendment to become confused about when to assert it again, especially where there exists a language barrier, the IJ expressly permitted Garcia-Quintero's attorney to consult with and advise Garcia-Quintero. Upon hearing a question put forth by the Government that he thought triggered the Fifth Amendment, Garcia-Quintero's attorney could have objected,[10] or asked to consult with his client. The attorney did neither, and we cannot now say that the IJ violated Garcia-Quintero's constitutional rights, or that the removal hearing was improper.

## III.   Conclusion

When the INS accepted Garcia-Quintero into the FUP in 1993, it authorized him to remain and work in the United States for renewable two-year periods while he adjusted to LPR status. He was also permitted to, and did, travel outside the United States upon authorization. As an FUP beneficiary, Garcia-Quintero held the same job for five years, paid United

---

[10]In support of his argument, Garcia-Quintero cites *Glanzer*, in which an attorney objected to a question on behalf of his client. In so doing, Garcia-Quintero ignores two critical distinctions between *Glanzer* and this case. In *Glanzer*, the attorney objected to the question immediately after opposing counsel posed it, and his client remained silent. 232 F.3d at 1263. Here, however, Garcia-Quintero's attorney did not voice any objections until *after* the Government and the IJ finished examining his client, and *after* Garcia-Quintero answered the questions.

States taxes, and raised a family. We hold that Garcia-Quintero's acceptance into the FUP rendered him "admitted in any status." He is therefore eligible for cancellation of removal, and we remand to the BIA for further proceedings consistent with this opinion. However, because Garcia-Quintero did not invoke his Fifth Amendment right, but instead admitted that he had engaged in alien smuggling, we deny his challenge to the BIA's order affirming the IJ's determination that Garcia-Quintero is removable. We therefore grant Garcia-Quintero's petition for review in part and deny it in part.

Petition GRANTED in part and **REMANDED** for further proceedings; **DENIED** in part.

---

GRABER, Circuit Judge, concurring in part and dissenting in part:

Although I concur in the majority's analysis of the Fifth Amendment issue and agree that the deference we owe to the Board of Immigration Appeals ("BIA") is defined by *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), rather than by *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), I respectfully dissent from the majority's conclusion that the BIA misinterpreted 8 U.S.C. § 1229b(a)(2).

Title 8 U.S.C. § 1229b(a)(2) provides that cancellation of removal is available, at the Attorney General's discretion, for a legal permanent resident alien ("LPR") who is inadmissible or deportable if (among other criteria) he "has resided in the United States continuously for 7 years *after having been admitted* in any status." (Emphasis added.) There is no dispute that Petitioner's period of continuous residence ended on June 8, 2001, when he attempted to smuggle an alien into the United States. 8 U.S.C. § 1229b(d)(1). There also is no dis-

pute that Petitioner entered the United States illegally in 1986. The question presented is whether Petitioner was "admitted" to the United States in 1998, when he became an LPR, or in 1993, when he was accepted into the Family Unity Program.

Congress has defined "admitted" as follows:

> The terms "admission" and "admitted" mean, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer.

8 U.S.C. § 1101(a)(13). It is reasonable and persuasive for the BIA to rely on that statutory definition of "admitted" in construing the term "admitted" in § 1229b(a)(2).

The majority emphasizes that the "BIA's analysis suffers fatally," majority op. at 8247, because the agency held in *In re Rosas-Ramirez*, 22 I. & N. Dec. 616 (B.I.A. 1999), that the attainment of LPR status constitutes "admission," even when an alien entered without inspection. There are two difficulties with the majority's conclusion in this regard. First, the BIA's decision here gave Petitioner the benefit of that interpretation by conceding his "admission" in 1998. Second, and more importantly, the BIA's decision in *Rosas-Ramirez* is consistent with its construction of a materially different section of the statute here.

In *Rosas-Ramirez* the BIA majority relied on the fact that the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009 (Sept. 30, 1996), provides for removal of aliens who, it turns out, were *in*admissible " 'at the time of entry *or* adjustment of status.' " 22 I. & N. Dec. at 621 (emphasis added) (quoting § 237(a)(1)(A) of the Act). The decision reasoned that this section—by referring to those who were *in*admissible either at the time of entry *or* at the time of adjustment of status—implicitly recognizes its opposite: that aliens can be *admissi-*

*ble*, and admitted, either at the time of entry *or* at the time of adjustment of status. *Id.* at 621-23. The BIA majority in *Rosas-Ramirez* also pointed to the fact that 8 U.S.C. § 1101(a)(20) defines the term " 'lawfully *admitted* for permanent residence' " as a "status" rather than as an event, a definition of admission in the LPR context that encompasses both admissions to LPR status at the border and later adjustment to LPR status. 22 I. & N. Dec. at 618-19 (emphasis added).

By contrast, the statute establishing the Family Unity Program ("FUP"), Pub. L. No. 101-649, § 301, 101 Stat. 4978 (Nov. 29, 1990) (IMMACT), contains no text that necessarily implies that acceptance into the program constitutes a form of "admission" into the United States. The statute defines an "eligible immigrant" in terms of relationship to a "legalized alien,"[1] not in terms of whether, when, or how "admission" takes place. *Id.* § 301(b). An alien is eligible only if he or she "entered" the United States before May 5, 1988, "resided" here on that date, and was *not* "lawfully admitted for permanent residence." *Id.* § 301(a). By using the term "entered" without the qualifying phrase in the usual definition of "admitted" and by expressly excluding those who were "admitted" as LPRs, Congress omitted any suggestion that acceptance into the FUP is a form of "admission" into the United States. In substance, the statute simply allowed certain aliens to remain in the United States and to work under a temporary grant of "voluntary departure" while waiting for their *potential* adjustment to LPR status—that is, for *potential* "admission."

---

[1]Unlike the term "eligible immigrant," the term "legalized alien" does make reference to the concept of "admission." Section 301(b)(2) defines "legalized alien" to mean certain aliens "lawfully admitted for temporary or permanent residence." The absence of a reference to "admission" in the definition of an "eligible immigrant" like Petitioner further suggests that "admission" is not a necessary consequence of acceptance into the Family Unity Program.

Critically, too, § 301(c) provides that, "[e]xcept as otherwise *specifically* provided in this section, the definitions contained in the Immigration and Nationality Act shall apply in the administration of this section." (Emphasis added.) In other words, Congress directed the BIA's attention, and ours, to 8 U.S.C. § 1101(a)(13).

Additionally, the majority relegates § 301(f) to a footnote, majority op. at 8249 n.7, but that section supports—even if it does not compel—the BIA's interpretation. Section 301(f) states that "[n]othing in this section shall be construed as authorizing an alien to apply for admission to, or to be admitted to, the United States in order to obtain benefits under this section." As the majority properly notes, this section bars aliens who resided outside the United States on the date of IMMACT's enactment from entering in order to apply for FUP benefits. This section conveys two additional things about congressional intent as well. The first is that Congress viewed the Family Unity Program as the receipt of "benefits," rather than as a form of "admission" into the United States. The second is that Congress generally intended to grant those "benefits" without expanding the population of aliens "admitted to" the United States.

Finally, it is worth noting that the Fifth Circuit has decided the precise question that we face. That court held that the BIA properly interpreted the statute. *Diaz v. Ashcroft*, 108 F. App'x 972 (5th Cir. 2004) (unpublished decision). Although the decision is unpublished, Fifth Circuit Rule 47.5.4 allows citation to an unpublished decision for its persuasive value. National uniformity is especially important in immigration matters. *See Ferreira v. Ashcroft*, 382 F.3d 1045, 1050 (9th Cir. 2004) (noting that the need for national uniformity is "paramount" in the immigration context). We should not lightly dismiss the Fifth Circuit's conclusion.

I do not suggest that the majority's interpretation of this ambiguous statute is wholly untenable, and I am sympathetic

to the majority's desire for generosity toward aliens who reside, with their families, within our borders. But, in my view, the BIA's interpretation more faithfully represents the law that Congress decided to enact. Therefore, I would deny the petition in its entirety.