**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JAMES BARIA CORPUZ,

　　　　　　　　*Petitioner,*

v.

ERIC H. HOLDER Jr., Attorney
General,

　　　　　　　　*Respondent.*

No. 09-70181

Agency No.
A038-466-143

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
October 14, 2011—San Francisco, California

Filed August 31, 2012

Before: Procter Hug, Jr., Andrew J. Kleinfeld, and
William A. Fletcher, Circuit Judges.

Opinion by Judge William A. Fletcher;
Dissent by Judge Kleinfeld

10417

**COUNSEL**

Jon Eric Garde, JEGLAW, LTD., Las Vegas, Nevada, for the petitioner.

Michele Yvette Frances Sarko, U.S. DEPARTMENT OF JUSTICE, Washington, D.C., for the respondent.

**OPINION**

W. FLETCHER, Circuit Judge:

Petitioner James Baria Corpuz petitions for review of a Board of Immigration Appeals ("BIA") decision declaring him ineligible for relief under former § 212(c) of the Immigration and Nationality Act ("INA") on the ground that he had served a "term of imprisonment" of over five years for conviction of an aggravated felony. Corpuz contends that the BIA improperly included in his "term of imprisonment" the entire period that he spent in psychiatric pre-trial civil confinement pending a determination of his competence to stand trial. We grant Corpuz's petition and remand for further proceedings.

## I. Background

Corpuz is a Philippine citizen. He entered the United States on an immigrant visa in Honolulu, Hawaii, in 1983. He was then 16 years old. He and his family moved to Las Vegas, Nevada, where he completed two years of college with a major in biochemistry.

Suffering from mental illness, Corpuz killed his mother on Mother's Day, May 14, 1989, by striking her with a hammer. He was arrested and initially held in police custody in the psychiatric unit of the Clark County Detention Center. On July 14, 1989, he was transferred to Lake's Crossing Center ("Lake's Crossing"), a secure psychiatric facility in Nevada, pending a determination of his competence to stand trial. He was civilly confined at Lake's Crossing for slightly over a year. Corpuz was found incompetent to stand trial in December 1989. The following summer, he was found competent. He was released from Lake's Crossing on August 10, 1990, and transferred back to law enforcement custody.

On September 7, 1990, Corpuz was charged in Nevada state court with first-degree murder. On January 18, 1991, an amended information reduced the charge to voluntary manslaughter. Corpuz pled guilty to the reduced charge. He was sentenced on February 27, 1991, to eight years (2,922 days) in the Nevada State Penitentiary "with credit for time served of 654 days." Of those 654 days, 392 had been spent in civil confinement at Lake's Crossing. With 654 days credit for time served subtracted from his 2,922-day sentence, Corpuz's post-conviction sentence was 2,268 days.

An Immigration and Naturalization Service "Memorandum of Investigation" in the record, dated April 4, 1991, states:

> SUBJECT was convicted on 2/27/91 in Las Vegas for the offense of Voluntary Manslaughter. He was sentenced to eight (8) years in the Nevada State Prison. SUBJECT immigrated to the United States on 12/22/83 through POE-HHW as a P5-3. SUBJECT committed the above act on 5/14/89. No other criminal history could be found on SUBJECT. SUBJECT is not amenable to deportation proceedings at this time.

Corpuz was released from prison on August 1, 1994, after having served 1,251 days of post-conviction imprisonment,

approximately 55 percent of his 2,268-day post-conviction sentence. Good time credit accounts for the reduced time that Corpuz actually served on his sentence, though it is unclear from the record whether Corpuz received good time credit only for the period he spent in post-conviction imprisonment or whether he also received constructive good time credit for the period he spent detained in jail and at Lake's Crossing. Corpuz was not charged with deportability upon his release from prison.

Corpuz married Carolyn Dubry, an American citizen, on January 4, 1997. He and his wife have two citizen children: Alexander, born on December 11, 1997, and Amelia, born on September 22, 2000. Corpuz has worked steadily as an electrician since at least September 2000. His wife has worked steadily as a hair stylist since at least December 2000. (The forms in the record do not ask about their employment prior to 2000.) Corpuz and his wife own their own home in Las Vegas.

Corpuz was served with a Notice to Appear ("NTA") in September 2003. In his brief to the BIA, Corpuz recounted that the NTA was served shortly after he "inquired of a member of his church, a Department of Homeland Security employee, . . . about becoming a U.S. citizen, conveying his criminal history."

The NTA alleged that Corpuz was removable pursuant to INA § 237(a)(2)(A)(iii) for having been convicted of an aggravated felony as defined by INA § 101(a)(43)(F). At a master hearing on October 9, 2003, Corpuz admitted the factual allegations in the NTA, conceded removability, and requested relief under former INA § 212(c). The Immigration Judge ("IJ") found Corpuz removable and continued the hearing to a later date. The government initially agreed that Corpuz was eligible to apply for a § 212(c) waiver, but later changed its view.

Section 212(c) provided, at the time relevant to Corpuz's case, that relief under the section was not available to "an[y] alien who has been convicted of one or more aggravated felonies and has served for such felony or felonies a term of imprisonment of at least 5 years." 8 U.S.C. § 1182(c) (1992). The disputed question before the IJ was whether Corpuz had served a "term of imprisonment" of at least five years for his voluntary manslaughter conviction.

The IJ concluded that all of the 392 days Corpuz had spent in civil detention at Lake's Crossing counted toward his "term of imprisonment." Based on this conclusion, the IJ held that Corpuz served approximately five years and two months of "imprisonment." The IJ therefore held that Corpuz was a "removable alien without access to relief from removal" and ordered him removed.

The BIA dismissed Corpuz's appeal in a per curiam order. The BIA found Corpuz ineligible for a § 212(c) waiver because he had not established that § 212(c) contained "a ground of inadmissibility that is comparable to the ground upon which he [was] removable." (The Supreme Court has since abrogated the comparable-grounds approach employed by the BIA, finding it arbitrary and capricious under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). *See Judulang v. Holder*, 132 S. Ct. 476, 487, 490 (2011).) Corpuz filed a Petition for Review with this court.

Meanwhile, Corpuz's wife submitted a Form I-130 Petition for Alien Relative. Corpuz then filed a Form I-485 Application to Adjust Status, followed by a Motion to Reopen with the BIA. The BIA denied Corpuz's motion on the ground that Corpuz had not presented any previously unavailable evidence. Corpuz filed a second Petition for Review with this court.

We consolidated Corpuz's two Petitions for Review. In a memorandum disposition, we granted the petitions and

remanded to the BIA for consideration of Corpuz's "claim of eligibility for *Gabryelsky* relief," including his "twin contentions that he [is] eligible for adjustment of status and eligible for a § 212(c) waiver." *See In re Gabryelsky*, 20 I. & N. Dec. 750 (BIA 1993) (holding that an alien may apply for § 212(c) relief in conjunction with an application for adjustment of status).

In an unpublished one-member decision, the BIA again dismissed Corpuz's appeal and denied his Motion to Reopen. The BIA rejected Corpuz's contention that his time at Lake's Crossing was not part of his "term of imprisonment" within the meaning of § 212(c). Corpuz again filed a Petition for Review. That petition is now before us.

## II.   Standard of Review

Because Corpuz is removable by reason of having committed an aggravated felony, our review of his petition is limited to constitutional claims and questions of law. *See* 8 U.S.C. § 1252(a)(2)(C)-(D). "Where as here, the BIA has conducted a *de novo* review of the IJ's decision, we review only the decision of the BIA." *Hernandez v. Ashcroft*, 345 F.3d 824, 832 (9th Cir. 2003). The BIA's factual determinations are reviewed for substantial evidence. *Id.*

We review *de novo* the BIA's resolution of questions of law, "except to the extent that deference is owed to [the BIA's] interpretation of the governing statutes and regulations." *Garcia-Quintero v. Gonzales*, 455 F.3d 1006, 1011 (9th Cir. 2006). Deferential review under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), is applicable only to agency interpretations set forth as precedent. *Garcia-Quintero*, 455 F.3d at 1012 ("[T]he 'essential factor' in determining whether an agency action warrants *Chevron* deference is its precedential value."). We do not apply *Chevron* deference to a single-member, unpublished, non-precedential decision of the BIA if the decision

concerns a question of statutory construction on which the BIA has never issued a published decision. *Id.* at 1012-14. In such a case, the deference we afford the BIA's decision "depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id.* at 1014 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

## III. Discussion

### A. Applicable Version of § 212(c)

Former § 212(c), codified at 8 U.S.C. § 1182(c), originally provided: "Aliens lawfully admitted for permanent residen[ce] who temporarily proceeded abroad voluntarily and not under an order of deportation, and who are returning to a lawful unrelinquished domicile of seven consecutive years, may be admitted in the discretion of the Attorney General . . . ." 8 U.S.C. § 1182(c) (1991). The BIA interpreted this provision beyond its literal language "to authorize any permanent resident alien with a lawful unrelinquished domicile of seven consecutive years to apply for a discretionary waiver from deportation." *INS v. St. Cyr*, 533 U.S. 289, 295 (2001) (internal quotation marks and citation omitted); *see also* 8 C.F.R. § 1212.3(h)(1). *But see Abebe v. Mukasey*, 554 F.3d 1203 (9th Cir. 2009) (en banc).

The Immigration Act of 1990 amended § 212(c), making ineligible for relief under that section "an[y] alien who has been convicted of an aggravated felony and has served a term of imprisonment of at least 5 years." Pub. L. No. 101-649, § 511(a), 104 Stat. 4978, 5052. The Immigration Technical Corrections Act of 1991 then amended this language to "an[y] alien who has been convicted of one or more aggravated felonies and has served for such felony or felonies a term of imprisonment of at least 5 years." Pub. L. No. 102-232, § 306(a)(10), 105 Stat. 1733, 1751 (codified as amended at 8

U.S.C. § 1182(c) (1992)). Congress specified that the 1991 amendment was to take effect as if included as a provision in the Immigration Act of 1990. Pub. L. No. 102-232, § 310(1), 105 Stat. 1733, 1759.

In 1996, Congress amended § 212(c) to preclude from relief aliens who had committed certain crimes, regardless of the length of the term of imprisonment imposed. *See* Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 440(d), 110 Stat. 1214, 1277. Later that year, in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Congress finally repealed § 212(c) entirely. Pub. L. No. 104-208, § 304(b), 110 Stat. 3009, 3597.

In *St. Cyr*, the Supreme Court held that "depriving removable aliens of consideration for § 212(c) relief produces an impermissible retroactive effect for aliens who . . . were convicted pursuant to a plea agreement at a time when their plea would not have rendered them ineligible for § 212(c) relief." *St. Cyr*, 533 U.S. at 320; *see also* 8 C.F.R. § 1212.3 (providing procedures for implementing *St. Cyr*). Aliens who would have been eligible for § 212(c) relief at the time they entered a plea agreement thus remain eligible even after IIRIRA's passage. Under *St. Cyr*, we look to § 212(c) as it existed at the time of a petitioner's plea.

**[1]** Corpuz was convicted pursuant to a plea agreement in 1991, after the 1990 and 1991 amendments to, but before the wholesale repeal of, § 212(c). Under *St. Cyr*, Corpuz remains eligible for § 212(c) relief to the extent he would have been when he entered his plea agreement. There is no dispute that Corpuz has been convicted of an aggravated felony. He is eligible for § 212(c) relief if he served less than a five-year "term of imprisonment" for that conviction, as that phrase was understood in 1991.

### B.   Calculation of "Term of Imprisonment"

**[2]** The question before us is whether all or part of the time Corpuz spent in pre-trial civil psychiatric confinement should

be included in his "term of imprisonment" under § 212(c). The question is one of first impression in this circuit. It is a question of statutory interpretation over which we have jurisdiction.

"In attempting to determine the meaning of a statute, we look first to the plain meaning . . . and give effect to that meaning where fairly possible." *Gomez-Lopez v. Ashcroft*, 393 F.3d 882, 885 (9th Cir. 2005) (alteration in original) (internal quotation marks and citation omitted); *see also United States v. Rosales*, 516 F.3d 749, 758 (9th Cir. 2008) ("Statutory interpretation begins with the plain language of the statute." (internal alteration, quotation marks, and citation omitted)). The meaning of "term of imprisonment" in § 212(c) depends on the meaning of "imprisonment."

**[3]** We do not conclude the word "imprisonment" has a "plain meaning," such that we are compelled to follow that meaning. But the word does have a common meaning that influences our understanding of the word as it is used in § 212(c). The common meaning of "imprisonment" is incarceration in a prison, jail, or other penal institution. *See, e.g.*, *United States v. Miller*, 547 F.3d 1207, 1213 (9th Cir. 2008) (incarceration in county jail work release program constituted part of defendant's term of imprisonment where defendant remained under the authority of the Bureau of Prisons); *United States v. Gonzales*, 506 F.3d 940, 948 (9th Cir. 2007) (en banc) (Ikuta, J., concurring in part and dissenting in part) (under the Sentencing Guidelines, "when a court sentences a defendant to 30-days jail time, it is a 'term of imprisonment' "); *United States v. Morgan*, 390 F.3d 1072, 1074 (8th Cir. 2004) (observing that the Sentencing Guidelines "define[ ] a sentence of imprisonment as a sentence of incarceration"). This common meaning of "imprisonment" does not include civil confinement or detention. *See United States v. Baker*, 45 F.3d 837, 844 (4th Cir. 1995) (though "the involuntary [civil] commitment of an individual is a substantial curtailment of that individual's liberty," it "is not as great as the

curtailment inherent in criminal imprisonment," and is not punitive).

In *Allen v. Illinois*, 478 U.S. 364 (1986), the Supreme Court was at pains to distinguish civil from criminal confinement. Petitioner had argued that indefinite confinement in a psychiatric facility after a civil proceeding in which he had been declared a "sexually dangerous person" under Illinois law was criminal confinement, triggering application of the Fifth Amendment privilege against self-incrimination. The Court disagreed:

> [T]he State has disavowed any interest in punishment, provided for the treatment of those it commits, and established a system under which committed persons may be released after the briefest time in confinement. The Act thus does not appear to promote either of the traditional aims of punishment — retribution and deterrence.

*Id.* at 370 (internal quotation marks and citation omitted); *see also Kansas v. Hendricks*, 521 U.S. 346, 361-69 (1997) (involuntary commitment proceeding not a criminal proceeding); *Matter of K*, 3 I. & N. Dec. 48 (BIA 1947) (commitment to mental institution following conviction not imprisonment for purposes of § 19 of the Immigration Act of 1917).

**[4]** We have specifically held that civil confinement in a psychiatric facility to determine competence to stand trial is not the same as post-conviction criminal confinement. We wrote in *Makal v. Arizona*, 544 F.2d 1030, 1035 (9th Cir. 1976):

> Petitioner had been charged with a capital crime and for his own protection was hospitalized so that a trial, if it occurred at all, would take place only when he was mentally competent to participate and protect his own interests. He was not confined for purposes

of punishment, and we cannot find that his stay at the hospital was a part of his punishment for the commission of a crime.

Because petitioner's pre-trial confinement had been civil and was not custody related to his guilt, we held that the Equal Protection Clause did not require that petitioner be given credit against his criminal sentence for the time he had spent in the psychiatric facility. *Id.*

**[5]** Since civil confinement or detention in a psychiatric facility for purposes of determining competence to stand trial is not "imprisonment," as that term is commonly understood, it could be reasonably argued that none of the 392 days that Corpuz spent at Lake's Crossing should be counted as part of his "term of imprisonment." Indeed, considered purely as a textual matter, this is the most sensible reading of the term "imprisonment" in § 212(c). Our analysis would end here had Corpuz only been civilly confined at Lake's Crossing and the question was whether he had been "imprisoned" there. However, that is not the case, for Corpuz was given a criminal sentence, and was given credit against that sentence for the time he spent at Lake's Crossing. Where a defendant receives credit against a criminal sentence for time spent in civil confinement, it is obvious that reading § 212(c) without taking at least some of this time into consideration would frustrate the purpose of the "term of imprisonment" provision. But we should not forget that, in so treating time spent in civil confinement, we are violating the common meaning of "imprisonment." We should violate that common meaning only insofar as necessary to serve the clear purpose of the five-year provision of § 212(c).

Section 212(c) uses the five-year "imprisonment" period as a proxy for the seriousness of the crime committed by an alien who is seeking § 212(c) relief. *See Moreno-Cebrero v. Gonzales*, 485 F.3d 395, 400 (7th Cir. 2007). By focusing on time actually served, the five-year provision also takes into account

an alien's behavior in prison, as good behavior will allow the alien to accumulate good time credit and thus obtain an earlier release. If the crime is very serious and the alien's prison conduct is poor — and if, as a result, the time served as the "term of imprisonment" is five years or more — the alien is statutorily ineligible for relief under § 212(c). If the crime is not very serious and the alien's prison conduct is good — and if, as a result, the time served is less than five years — the alien is statutorily eligible for relief.

It is commonplace for judges to give credit against a criminal sentence for time served in pre-trial detention. If we were to ignore such time in calculating a defendant's "term of imprisonment" under § 212(c), our calculation would not accurately reflect the seriousness of the alien's crime and the nature of his prison conduct.

Consider two cases in which similarly situated defendants have committed the same crime. The judge sentences the first defendant to ten years' imprisonment, with credit for four years of civil confinement in a psychiatric facility pending a determination of competence to stand trial. In this case, the time actually served in prison, given the accumulation of prison good time credit, will almost certainly be less than five years. The judge sentences the second defendant to ten years in prison straight up. This defendant spent no time in a psychiatric facility prior to his conviction. Even assuming the second defendant, while imprisoned, accumulates good time credit at the same rate as the first defendant, the time actually served in prison will almost certainly be more than five years.

If we consider only the time spent in prison in the first defendant's case, we frustrate the purpose of the five-year "term of imprisonment" provision of § 212(c). Given the length of time actually served by the second defendant, we know that he is statutorily ineligible for § 212(c) relief due to the seriousness of his crime. Because the first defendant committed the same crime, received the same sentence, and accu-

mulated good time credit at the same rate while in prison, he should also be statutorily ineligible for § 212(c) relief. Yet if we cannot count any of the time he spent in the psychiatric facility as part of his "term of imprisonment," we would be compelled to conclude that he is eligible. Congress could not have intended such a result. "[W]e are not required to interpret a statute in a formalistic manner when such an interpretation would produce a result contrary to the statute's purpose or lead to unreasonable results." *United States v. Combs*, 379 F.3d 564, 569 (9th Cir. 2004).

**[6]** In order to achieve the statutory purpose of the five-year "term of imprisonment" provision in § 212(c), we therefore must count, in some manner, the time a defendant spends in pre-trial civil psychiatric confinement if that time is credited against the defendant's sentence. The question is how this time should be counted. We conclude that time spent in civil psychiatric confinement that is credited against a defendant's sentence should be counted in a manner that allows us to approximate, as closely as possible, the time the defendant would have served in prison had he never been in civil psychiatric confinement. This means that we should determine a constructive good time credit for the period spent in civil confinement based on the degree to which the defendant accumulated good time credit while in prison. The period spent in pre-trial psychiatric confinement should be calculated as part of the defendant's "term of imprisonment" only after this constructive good time credit is taken into account.

For a simple illustration, consider the first defendant described above. He was sentenced to ten years, with credit for four years spent in civil psychiatric confinement. Receiving credit for four years already served reduced the remaining time on his sentence to six years. Assume that the defendant was unable to accumulate good time credit while he was in civil psychiatric confinement, but that he accumulated two years of good time credit while in prison, such that he was released after serving four years of imprisonment. Four years

is two-thirds of the six years which he was sentenced to serve in post-conviction imprisonment. In order to treat the time spent in civil psychiatric confinement in a manner that approximates the time the defendant would have spent in prison had he simply been sentenced to ten years in prison without credit for time served, we should count two-thirds of the four years he spent in psychiatric confinement as part of his "term of imprisonment" for purposes of § 212(c). Two-thirds of four years (48 months) is 32 months. Thirty-two months should therefore be added to the four years the defendant actually spent in prison. The total "term of imprisonment," for purposes of § 212(c) would thus be six years and eight months.

There is nothing in the text of § 212(c) that prescribes the above manner of accounting for credited time spent in civil psychiatric confinement. However, we have already moved beyond the bare text of § 212(c), for if we consider only the text, the common meaning of the word "imprisonment" would compel us to conclude that *none* of the time a defendant spent in psychiatric civil confinement counts as part of that defendant's term of "imprisonment." As between these two imperfect readings of the "term of imprisonment" provision of § 212(c), we prefer the reading that serves the obvious purpose of the provision.

### C.   Objections

There are several possible objections to our manner of calculating time spent in pre-trial civil psychiatric confinement. We take them in turn.

#### 1.   Difference Between Pre-trial Civil Psychiatric Confinement and Pre-trial Incarceration in Jail or Prison

Several circuits have held that time spent in non-civil pre-trial incarceration — that is, in ordinary pre-trial incarceration — constitutes part of a defendant's "term of imprisonment"

for purposes of § 212(c). *See Palmer v. Att'y Gen.*, 421 F. App'x 181, 183 n.3 (3d Cir. Apr. 5, 2011) (unpublished); *Moreno-Cebrero*, 485 F.3d at 395 (7th Cir. 2007); *Spina v. Dep't of Homeland Sec.*, 470 F.3d 116, 125 (2d Cir. 2006); *see also Bosquest v. Ashcroft*, 2005 WL 1278272, at *5 (S.D.N.Y. May 27, 2005); *Jackson v. Ashcroft*, 2003 WL 22272593, at *4-5 (D. Conn. Sep. 28, 2003); *Gordon v. Ashcroft*, 283 F. Supp. 2d 435, 436, 439-40 (D. Mass. 2003); *Saldana v. Demore*, 2002 WL 1000168, at *2-3 (N.D. Cal. May 3, 2002). We have not decided in this circuit whether ordinary pre-trial incarceration should be counted as part of a defendant's "term of imprisonment" under § 212(c). However, in *Arreguin-Moreno v. Mukasey*, 511 F.3d 1229, 1230 (9th Cir. 2008), we addressed the similar issue of whether "time spent in pre-trial detention, which is credited as time served in a sentence imposed after conviction, is considered to be confinement as a result of a conviction within the meaning of 8 U.S.C. § 1101(f)(7)." *Id.* at 1230. We held that such time should be counted. *Id.*; *see also In re Valdovinos*, 18 I. & N. Dec. 343 (BIA 1982) (same).

None of the above cases addressed the issue of good time credit. We are willing to assume that, for purposes of § 212(c)'s "term of imprisonment" provision, constructive good time credit should not be awarded for ordinary pre-trial incarceration. There are at least two good reasons for such an assumption. The first is linguistic. Ordinary pre-trial incarceration is typically spent in a jail or other penal institution; confinement in a jail or similar institution is commonly understood to be a form of "imprisonment"; and the text of § 212(c) tells us that time spent in "imprisonment" is part of the five-year period. The second is practical. Largely because of speedy trial rules, time spent in ordinary pre-trial incarceration is limited and somewhat predictable. *See* 18 U.S.C. § 3161; *Doggett v. United States*, 505 U.S. 647, 662 (1992) (the Speedy Trial Clause is designed "to prevent oppressive pretrial incarceration").

Neither reason applies to pre-trial civil confinement to determine competence to stand trial. First, as already discussed, the common understanding of the word "imprisonment" does not include civil confinement. If we were to use the common understanding of the term, we would not count such confinement at all. Counting such time, but with an allowance for constructive good time credit, allows us to serve, as near as may be, the purpose of § 212(c). Second, the length of pre-trial civil confinement to determine competence to stand trial is unlimited and unpredictable. It is often quite long, sometimes lasting many years. *See Sell v. United States*, 539 U.S. 166, 180 (2003) (recognizing that pre-trial psychiatric confinement to restore competence to stand trial may be lengthy).

Finally, ordinary pre-trial incarceration is common, and Congress almost certainly considered it when enacting the five-year "term of imprisonment" provision of § 212(c). In contrast, pre-trial psychiatric confinement to determine competence to stand trial is comparatively unusual. There is nothing in the language or history of § 212(c) to indicate that Congress had civil psychiatric confinement in mind when it adopted the five-year "imprisonment" provision. There is certainly nothing to suggest that Congress would have intended, if it had considered the question, to count the entire period of a civil confinement, when credited against a criminal sentence, as part of the "term of imprisonment."

### 2.   Definition of "Imprisonment" in IIRIRA

In 1996, as part of IIRIRA, Congress specifically defined "term of imprisonment" for the first time, including in the definition "the period of incarceration or confinement ordered by a court." Pub. L. No. 104-208, § 322, 110 Stat. 3009, 3009-628 (codified at 8 U.S.C. § 1101(a)(48)(B)). This definition indicates that, as of 1996, civil confinement ordered by a court is part of a defendant's "term of imprisonment." However, under *St. Cyr*, we are required to look to the law as it

existed in 1991. "If we are to be consistent in applying § 212(c) as it existed prior to IIRIRA, as *St. Cyr* dictates for persons in [Corpuz's] situation, we should not use a definition that was not then part of the statute." *Moreno-Cebrero*, 485 F.3d at 398. Further, we note that IIRIRA, which contains the new definition, entirely repealed § 212(c). We do not believe that we should interpret a statute using a definition that is contained in an act that repeals that very statute.

### 3.   Imprecision of Calculation

The calculation of the amount of constructive good time credit to which a defendant is entitled for purposes of determining the length of his "term of imprisonment" under § 212(c) may be somewhat imprecise, depending on the nature of a prison's good time regulations. A calculation of a "term of imprisonment" using all of the time spent in civil confinement, by contrast, would be both easy and precise. However, we believe a fair approximation is superior to a precise but unfair calculation. Counting a period spent in pre-trial civil psychiatric confinement as part of a defendant's "term of imprisonment" without providing for any constructive good time credit for that period would result in an arbitrary and unfair distinction between mentally ill defendants who must be restored to competence to stand trial, and other defendants, similarly situated in all other respects, who are immediately competent to stand trial.

While the required calculation may be somewhat imprecise, it is not based on speculation. We are not required to guess how a petitioner would have behaved in prison or how much good time he would have received. We know how he behaved, and we know how much prison good time he received. This known behavior and good time are the basis for a calculation of the good time he would have received had he spent his entire period of confinement in true "imprisonment."

### D.   Application to Present Case

If we calculate Corpuz's "term of imprisonment" under § 212(c) in the manner proposed by the government, we would add to the length of time Corpuz actually served in post-conviction imprisonment the full 654 days of credit for time served that he received at sentencing, including the 392 days credit he received for time spent at Lake's Crossing. This appears to result in a total term of imprisonment of about five years and two months. If this were the proper calculation, Corpuz would be ineligible for § 212(c) relief. However, this appears to be the proper calculation only if Corpuz has already received constructive good time credit for the period he spent at Lake's Crossing.

Unfortunately, on the current record we cannot confidently approximate the amount of time Corpuz would have actually served in post-conviction imprisonment had he never spent time at Lake's Crossing, because we do not know whether the Nevada Department of Corrections has already granted him constructive good time credit for the periods he spent in pre-trial psychiatric confinement and in ordinary pre-trial detention. The parties dispute whether Nevada defendants, such as Corpuz, who are given credit for time served at sentencing, are also given constructive good time credit for the period they spend in pre-trial confinement. There is nothing in the record that allows us, or our dissenting colleague, to resolve this dispute.

[7] Because we cannot confidently approximate how much time Corpuz would have actually served in prison had he never spent time in pre-trial psychiatric confinement, we grant Corpuz's Petition for Review and remand for a determination of the amount of constructive good time credit to which Corpuz is entitled (and may or may not have received) for the period of his civil confinement at Lake's Crossing.

We GRANT the Petition for Review and REMAND for further proceedings consistent with this opinion.

KLEINFELD, Senior Circuit Judge, dissenting:

I respectfully dissent.

The majority confuses the unknown with the unknowable. It coins the new term "constructive good time," under which immigration judges are now required to quantify the unknowable: how much good time a prisoner would have received, had he been in prison instead of where he actually was. This calculation is impossible—not difficult, impossible.

Corpuz concluded a Mother's Day quarrel with his mother by beating her head in with a hammer. After a lengthy period in jail, and then in a psychiatric facility to determine his competency to stand trial, he was found competent despite his schizophrenia. He pleaded guilty to voluntary manslaughter pursuant to a plea bargain. The sentencing judge credited the pre-conviction psychiatric confinement against Corpuz's prison sentence. Corpuz was free three and a half years after he pleaded guilty, but more than five years after his confinement began. Under the eligibility statute at issue, a petitioner is ineligible for relief from removal if he served "a term of imprisonment of at least 5 years."[1] Corpuz did.

---

[1]Immigration and Nationality Act § 212(c) (codified at 8 U.S.C. § 1182(c) (1992)) states in full:

> (c) Nonapplicability of subsection (a)

> Aliens lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation, and who are returning to a lawful unrelinquished domicile of seven consecutive years, may be admitted in the discretion of the Attorney General without regard to the provisions of subsection (a) of this section (other than paragraphs (3) and (9)(C)). Nothing contained in this subsection shall limit the authority of the Attorney General to exercise the discretion vested in him under section 1181(b) of this title. *The first sentence of this subsection shall not apply to an alien who has been convicted of one or more aggravated felonies and has served for such felony or felonies a term of imprisonment of at least 5 years.*

(emphasis added).

I agree with the majority that when a defendant receives credit against a criminal sentence for time spent in jail or psychiatric confinement before trial, the credited time should be treated as part of the five-year "term of imprisonment" under the statute. Our sister circuits that have addressed the issue also agree.[2] Treating this time credited against prison time as part of the five-year term of imprisonment is fair because the time was actually served in confinement and reduced the amount of time Corpuz would have otherwise spent in prison. The number is precise and not subject to dispute. This approach does not require the immigration judge, when determining eligibility, to quantify speculation. I also agree with the majority that no "constructive good time" should apply to credited pretrial confinement in jail.

The majority goes off the tracks with its novel concept, "constructive good time." There is no such thing in Nevada law (or anywhere else, so far as I know). Under this concept, an immigration judge must calculate how much good time a prisoner *would have* earned while he was in psychiatric confinement before trial, had he been in prison instead.

The majority begs the question with its phrase, "we believe a fair approximation is superior to a precise but unfair calculation." Obviously "fair" is superior to "unfair." But if no approximation is possible, then only speculation is possible, and speculation is unfair, arbitrary, and capricious. There is no way to know how much "constructive good time" Corpuz would have earned had he been in prison instead of a psychiatric facility.

Under Nevada good time law, for each month a prisoner serves, he is entitled to a ten-day deduction from his sentence if he had no serious infractions that month and properly per-

---

[2]*Moreno-Cebrero v. Gonzalez*, 485 F.3d 395, 398 (7th Cir. 2007); *Spina v. Dep't of Homeland Sec.*, 470 F.3d 116, 128 (2d Cir. 2006).

formed his assigned duties.[3] If he behaves himself, a Nevada prisoner earns his good time, but only as he goes, not up front.[4] Even if we assume that Corpuz would have behaved perfectly if he had been in prison rather than in a psychiatric facility, it would have taken him six years to earn enough ten-day credits to get out early on his eight-year sentence.[5] To get below the five-year eligibility period, Corpuz would have had to obtain extra credit good time by doing things such as earning his G.E.D.[6] or participating successfully in other programs.[7]

---

[3]Nev. Rev. Stat. § 209.446(1) states in full:

Every offender who is sentenced to prison for a crime committed on or after July 1, 1985, but before July 17, 1997, who has no serious infraction of the regulations of the Department, the terms and conditions of his or her residential confinement, or the laws of the State recorded against the offender, and who performs in a faithful, orderly and peaceable manner the duties assigned to the offender, must be allowed:

(a) For the period the offender is actually incarcerated under sentence;

(b) For the period the offender is in residential confinement; and

(c) For the period the offender is in the custody of the Division of Parole and Probation of the Department of Public Safety pursuant to NRS 209.4886 or 209.4888,

a deduction of 10 days from the offender's sentence for each month the offender serves.

[4]*See* Nev. Rev. Stat. §§ 209.432-209.451; *Hunt v. Warden*, 903 P.2d 826 (Nev. 1995).

[5]His sentence was 8 years, or 2920 days. Assuming he earned a 10 day deduction each month, it would have taken him 6 years to earn 720 days of good time (6 years x 12 months x 10 days = 720 days). This number, plus the time he already served (6 years x 365 days = 2190 days), gets him to 2910 days, just 10 days under his 8 year sentence (2920 days).

[6]Nev. Rev. Stat. § 209.446(2) states in part:

In addition to the credits allowed pursuant to this subsection, an offender is entitled to the following credits for educational achievement:

(a) For earning a general educational development certificate, 30 days.

Discretion plays a prominent role in the award and deduction of good time credits. The Director may award good time for "diligent and responsible"[8] behavior, and "exceptional meritorious service."[9] If a prisoner tests positive for alcohol or a controlled substance, the prisoner forfeits "all deductions earned by the offender before commission of the violation" *or* "such part of those deductions as the director considers just."[10] So a prisoner caught with pruno (a prisoner-manufactured alcoholic beverage) may lose all the good time he has earned over five years, or one year of good time, or ten days, or none. Good time is so discretionary, and so dependent on an inmate's individual conduct while in prison, that application of a formula is inherently and necessarily arbitrary and capricious. A formula is unfair to prison inmates who really try to do all the things that will earn them extra good time. Because no fair approximation can be made, all a remand in this case can do is cause delay and produce an arbitrary outcome.

The majority concedes that good time, constructive or otherwise, does not apply to pretrial jail time. There is no justification for inventing "constructive good time" for pretrial psychiatric confinement but not pretrial jail time. The majority argues first that jail time is shorter because of the Speedy

---

(b) For earning a high school diploma, 60 days.

(c) For earning an associate degree, 90 days.

[7]Nev. Rev. Stat. § 209.446(3) ("The Director may allow not more than 10 days of credit each month for an offender who participates in a diligent and responsible manner in a center for the purpose of making restitution, program for reentry of offenders and parolees into the community, conservation camp, program of work release or another program conducted outside of the prison.").

[8]*Id.*

[9]Nev. Rev. Stat. § 209.446(4) ("The Director may allow not more than 90 days of credit each year for an offender who engages in exceptional meritorious service.").

[10]Nev. Rev. Stat. § 209.367(5).

Trial Act,[11] and second that jail is more similar to prison than psychiatric confinement. The first argument lacks merit because a very short time, even a day, may make all the difference to eligibility under the statute, and the states follow their own speedy trial rules, not the federal Speedy Trial Act. The second argument cuts against the majority's position because the greater similarity of jail to prison implies that if good time is not credited for jail time, there is even less justification for inventing it for something even less like prison.

When a sentencing judge credits against a prison sentence time spent not in prison, whether in jail or a psychiatric facility, the prisoner gets the benefit of less time in prison. He also gets the burden of not being able to earn good time during the period when he was not in prison. He takes the bad with the good. The only fair thing we can do is treat pretrial jail time and psychiatric confinement the same way. Treating them differently, through the novel concept of "constructive good time," is illogical and unfair because it requires precise calculation of the inherently speculative and incalculable. "[W]e must . . . not look for the same degree of exactness in all our studies, but only for as much as the subject-matter in each case allows . . . ."[12] The majority's remand for a determination of the amount of constructive good time that Corpuz might have earned had he been in prison when he was not is precisely the error of attempting a more precise calculation than the subject matter allows.

---

[11]18 U.S.C. § 3161.

[12]Aristotle, The Nicomachean Ethics 76-77 (J.A.K. Thomson trans., Penguin Books 1976) (1953).